1    WO

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                **FOR THE DISTRICT OF ARIZONA**

8

9    Draco Aurum Rat,                          No. CV-20-0081-TUC-LCK

10                  Petitioner,                 **ORDER**

11   v.

12   David Shinn, et al.,

13                  Respondents.

14

15        Petitioner Draco Rat has filed a Petition for Writ of Habeas Corpus pursuant to 28

16   U.S.C. § 2254. Before the Court are the Amended Petition (Doc. 6), Respondents' Answer

17   (Doc. 12), and Rat's Reply (Doc. 17). The parties have consented to Magistrate Judge

18   jurisdiction. (Doc. 14.)

19               **FACTUAL AND PROCEDURAL BACKGROUND**

20        Rat was convicted in the Pima County Superior Court of indecent exposure to a

21   minor under 15, two counts of sexual misconduct with a minor under 15, and continuous

22   sexual abuse of a minor. (Doc. 6 at 2; Doc. 12 at 1.) Rat was sentenced to prison terms

23   totaling 60 years. (Doc. 6 at 2; Doc. 12 at 1.)

24        Rat appealed and the Arizona Court of Appeals affirmed his convictions and

25   sentences. (Doc. 12, Exs. A, B.) The Arizona Court of Appeals summarized the facts in

26   support of Rat's convictions:

27        When C.R. was twelve years old, Rat, her father, began touching her on her
          clitoris and inside her vagina. He would also have her touch his penis with
28        her hand. Later, Rat began having sexual intercourse with C.R., which he did
          multiple times. He touched her breasts and forced her to perform oral sex on

him. On one Sunday afternoon, he forced her to perform oral sex and then had sexual intercourse with her in a "reverse cowgirl" position.  On another occasion, Rat had C.R. take a picture of his bare penis.

¶ 3 In an online text conversation, C.R. told her friend H.F. that her father was raping her. H.F. told her school counselor, who in turn contacted the assistant principal at C.R.'s school. The assistant principal interviewed C.R. and contacted law enforcement.  Officers searched Rat's home and collected DNA from his sheets for testing. C.R.'s DNA was found on Rat's bedsheet.

(*Id.*, Ex. A ¶¶ 2-3.)

Rat filed a Notice of Post-Conviction Relief (PCR). (*Id.*, Ex. E.) After counsel averred that he could not find any basis for relief, the PCR court granted Rat time to file a pro se petition. (*Id.*, Exs. F-H.) Rat filed a Petition, which the PCR court dismissed without a hearing. (*Id.*, Exs. I, L.) Rat filed a Petition for Review and the court of appeals granted review but denied relief. (*Id.*, Exs. P, Q.) Rat did not seek review before the Arizona Supreme Court. (*Id.*, Ex. R.)

## DISCUSSION

Rat alleged nine claims before this Court. Respondents contend that Claims 6 and 9 are procedurally defaulted, but that the remainder of the claims were properly exhausted. The Court first will review the claims for exhaustion and procedural default and then review the remaining claims on the merits.

### EXHAUSTION AND PROCEDURAL DEFAULT

### Standard

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To properly exhaust, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy), *overruled on other grounds by Apelt v. Ryan*, 878 F.3d 800, 827 (9th Cir. 2017). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). However, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

## Analysis

In Claim 6, Rat alleges the prosecutor mischaracterized evidence and drew inferences in closing argument that were not supported by the evidence. In Claim 9, Rat alleges the prosecutor's misconduct in the aggregate denied his right to a fair trial and due process. These claims were raised in Rat's PCR Petition. (Doc. 12, Ex. I at 20-33.) The PCR court found the claims waived and precluded under Arizona Rule of Criminal

Procedure 32.2(a)(3) for failure to raise them on direct appeal. (Doc. 12, Ex. L at 8.) Rat raised these issues in his petition for review. (Doc. 12-3 at 17.) The appellate court affirmed the PCR court's ruling. (Doc. 12, Ex. Q at 3, 4.) Because the state court imposed a procedural bar as to Claims 6 and 9, they are procedurally defaulted in this Court.

**Cause and Prejudice and Fundamental Miscarriage of Justice**

Rat argues that he did not raise Claims 6 and 9 on direct appeal because he needed evidence outside the record to prove the claims. This was a choice made by Rat and/or appellate counsel. To the extent he made the decision not to raise prosecutorial misconduct on direct appeal, that cannot operate as cause because it is not attributable to something external to him. *Manning v. Foster*, 224 F.3d 1129, 1134 (9th Cir. 2000) (defining cause as "any 'objective factor' that is 'external' to the petitioner and that 'cannot fairly be attributed to him'") (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)).

However, ineffective assistance of counsel (IAC) may operate as cause. Rat argued that appellate counsel was constitutionally ineffective for not raising these claims on direct appeal. Before ineffectiveness of appellate counsel may be used to establish cause for a procedural default, it must have been presented in state court as an independent claim. *Murray v. Carrier*, 477 U.S. 478, 489 (1986). In the PCR Petition, Rat did not include a claim that appellate counsel was ineffective for failing to raise these prosecutorial misconduct claims. (Doc. 12, Ex. I.) In his reply brief before the PCR court, he argued the court should not find the prosecutorial misconduct claims precluded because his appellate counsel had been ineffective in failing to raise them. (Doc. 12, Ex. K at 7.) Thus, Rat did not allege appellate IAC as an independent claim before the PCR court. Further, claims not raised in a PCR Petition are waived, therefore, a PCR court need not consider claims raised for the first time in a reply brief. The PCR court did not rule on Petitioner's reply-brief allegation of appellate IAC. In his petition for review, Rat alleged that appellate counsel was ineffective for failing to raise claims of prosecutorial misconduct. (Doc. 12-3 at 19.) However, the appellate court refused to consider those claims because they had not been

included in the PCR Petition (Doc. 12, Ex. Q at 4 (citing *State v. Ramirez*, 616 P.2d 924, 928, 126 Ariz. 464, 468 (App.1980)). *See also* Ariz. R. Crim. P. 32.9(c)(1)(ii) (petition for review limited to "issues which were decided by the trial court and which the defendant wishes to present to the appellate court for review").

Thus, Rat failed to fairly present, in the PCR proceeding, a claim that appellate counsel was ineffective for failing to fairly present his prosecutorial misconduct claims. Ineffectiveness claims regarding counsel are now foreclosed in state court by Arizona Rule of Criminal Procedure 32.2(a)(3) and 32.4(a). Because the Arizona state courts have not had a fair opportunity to rule on ineffectiveness of appellate counsel, and Rat may not exhaust this claim now, it is technically exhausted but procedurally defaulted. *See Gray*, 518 U.S. at 161-62; *Coleman*, 501 U.S. at 735 n.1. Thus, IAC on appeal cannot operate as cause unless Petitioner established cause and prejudice to excuse the default of the appellate IAC claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (ineffective counsel as cause can itself be procedurally defaulted). Petitioner has made no argument that there is cause to excuse the default of a claim that appellate counsel was ineffective for failing to raise his defaulted claims. Therefore, IAC on appeal cannot operate as cause to excuse the default of Claims 6 and 9.

Rat did not contend that a fundamental miscarriage of justice would result if Claims 6 and 9 were not addressed on the merits by this Court. However, he mentioned that Arizona's appellate procedure resulted in a fundamental miscarriage of justice with respect to his prosecutorial misconduct claims. (Doc. 17 at 2.) Also, he alleged that he is innocent of the crimes. (*Id.* at 7.) Although Rat did not allege it as a means to overcome default, the Court will evaluate it for that purpose.

To demonstrate a fundamental miscarriage of justice to excuse a procedural default, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). To establish the requisite probability, the petitioner must show that "it is more likely than not

that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* The Supreme Court has characterized the exacting nature of an actual innocence claim as follows:

> [A] substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. . . . To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

*Id.* at 324; *see also House v. Bell*, 547 U.S. 518, 538 (2006). Rat cites the following evidence in support of his innocence, which he alleges was not presented properly at trial: the victim was on her computer when she alleged the abuse occurred; the victim had no vaginal trauma and none of Rat's DNA was found on her body; the victim's story changed and she had "reason to do this"; the victim's mother pushed her to make allegations against him throughout her life; and the victim testified that Rat ejaculated inside her hundreds of times but she did not become pregnant. Although this evidence could be exculpatory, it is not all new and it is not the type of reliable evidence sufficient to demonstrate a fundamental miscarriage of justice.

## MERITS

The Court will address on the merits Claims 1-5, 7, and 8.

### Legal Standards for Relief under the AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) created a "highly deferential standard for evaluating state-court rulings' . . . demand[ing] that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

- 6 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The last relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold test under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006).

The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents, under § 2254(d)(1), if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend the principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable," the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Visciotti*, 537 U.S. at 25. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as '"fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (Miller-El II). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-74; *Miller-El II*, 545 U.S. at 240.

## Ineffective Assistance of Counsel: Claims 1-5 and 8

In Claims 1-5, Rat alleges trial counsel was ineffective on five different grounds. In Claim 8, Rat alleges that cumulative error by counsel violated his constitutional rights.

### Standard

IAC claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687-88. The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see also Cheney v. Washington*, 614 F.3d 987, 994-95 (2010) (noting that review of a decision under *Strickland* and the AEDPA is "doubly deferential" because courts must be highly deferential in evaluating counsel's performance). Thus, to satisfy *Strickland's* first prong, deficient performance, a defendant must overcome "the

presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

A petitioner must affirmatively prove prejudice. *Id.* at 693. To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### Claim 1

Rat alleges counsel was ineffective for failing to adequately cross-examine the state's DNA expert and failing to hire a defense expert to rebut the state's DNA evidence. The PCR court made the following findings and denied this claim:

> Defendant proposes his own ideas regarding what a DNA expert might have provided to refute the State's theories or challenge the procedures used by the State's expert. However, Defendant includes no information that a DNA expert would in fact testify to his hypotheses. Without an affidavit or other reliable information stating what a DNA expert would offer as testimony, Defendant's conjecture on how his DNA transferred to the victim's person is not credible or useful.
>
> The theory of defense in this case ultimately posits that the victim made false allegations about any sexual conduct with Defendant. The defendant himself testified that he and the victim slept in the same bed, and that the source of his semen found in the bedsheets was from his private masturbatory activity. The defense's cross-examination of the State's expert masterfully pointed out that the expert could not say if the DNA she found from the defendant and the victim were contributed at the same time, she cannot say how long the DNA had been there, and she cannot say what the source of the DNA was that the victim contributed to the sample. All of those points made during cross-exam served the defendant's testimony and his defense. Based on trial counsel's ability to draw out these salient limitations of evidence from the State's expert, Defendant's claim has not shown that his attorneys fell below the standard of reasonableness set forth in *Strickland*. Nor has Defendant demonstrated a probability that the outcome of his trial would have been different had his attorneys hired a DNA expert.

(Doc. 12, Ex. L at 4.)

In the Petition, Rat offers his summary of some of the testimony by the state's DNA expert. (Doc. 6 at 6.) He does not, however, identify any questions counsel failed to ask on cross-examination. Nor does he identify any evidence counsel should have presented by

way of a defense expert. This limited, vague argument does not demonstrate that counsel's conduct was deficient or that he was prejudiced by counsel's performance.

In the Reply, Rat argues that a defense DNA expert could have helped counsel prepare in two ways: countering the state expert's insistence that the DNA evidence from the victim and Rat that was found in the same location on his sheets could not have been transfer DNA; and highlighting information from the lab reports in support of the defense theory that the DNA from the victim and Rat were not deposited on the sheet at the same time. Because these arguments were raised for the first time in a reply brief, the Court need not consider them. *See United States v. Bunnell*, No. CR-14-00119-PHX-DGC, 2021 WL 212338, at *2 (D. Ariz. Jan. 21, 2021) (citing *Signorelli v. Hughes*, 363 Fed. App'x 455 (9th Cir. 2010). However, the Court touches on them briefly as they do not change the outcome. First, the DNA on the sheets was necessarily "transferred" from the victim and Rat to the sheets. Without further context, it is unclear what benefit Rat believes he would have reaped from bolstering a theory of DNA transfer. Counsel was not deficient for failing to pursue this topic further, nor has Rat shown this point would have created a reasonable probability that he would not have been convicted. Next, the PCR court found that, during cross-examination, the state's expert acknowledged that the DNA from the victim and Rat could have gotten on the sheets at different times. There is not a reasonable probability that Rat would not have been found guilty if counsel had conducted further exploration of this same topic.

The state court's denial of this claim was not objectively unreasonable.

**Claim 2**

Rat alleges counsel failed to present certain exculpatory evidence uncovered by the state's computer forensics expert: (a) no images of adult pornography or juvenile imagery were found on Rat's computer; (b) the victim's computer showed continual activity from 4:43 until midnight, the period during which the victim testified that she took photos of Rat's genitals and he raped her; and (c) the victim was looking up sexually explicit material

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that same weekend. Rat contends that the defense asserted the victim had made up the sexual abuse and could have obtained the details for her allegations from the internet.

The PCR court made the following findings and denied this claim:

> The defendant's attorneys did not perform below standard in this instance, because there was no specific timeframe when the offenses were stated to have occurred and therefore trial counsel had nothing to present as a firm alibi. The suggestion that the victim's computer was active for a period of about seven hours on a particular night does not eliminate the opportunity for the offenses to have been committed. Furthermore, defendant's offer of "proof" that the victim conducted specific title searches at this time in an effort to challenge her credibility here presupposes the Court would have allowed the search terms to be used as evidence at trial. Thus, Defendant cannot show he has been prejudiced by his attorneys' choice not to pursue this.

(Doc. 12, Ex. L at 6-7.)

The fact that Rat did not have pornography on his computer is not exculpatory with respect to the crimes charged. Also, as found by the PCR court, the sexual abuse was alleged to have occurred over the course of two years; therefore, countering the victim's assertions about one particular night would not undermine the jury's basis for finding Rat guilty of the offenses. Additionally, Rat did not substantiate his theory that the court would have admitted the computer evidence to support his theory that the victim fabricated her allegations based on internet material. In support, he cited the titles for some web pages the victim had looked at on her computer. However, he did not provide the content of those pages or other pages looked at by the victim. And he did not link any of her testimony to information she could have gathered from content she reviewed on the internet. Because Rat's assertions about the relevance of this evidence is conclusory, there remains a substantial question whether the court would have admitted it. And, even if Rat had presented this evidence, it is not, standing alone, exculpatory and does not create a reasonable probability that he would not have been convicted. Therefore, the state court's denial of this claim was not objectively unreasonable.

**Claim 3**

Rat alleges counsel was ineffective for failing to investigate a possible alibi witness. He argues that the victim testified to nightly sexual activity with Rat from July 2012 to August 2014. However, the victim stayed at his house only Thursdays through Mondays. Rat asserts his brother and niece stayed at the home every other week from July to December 2012. Rat and his brother shared a bedroom; the victim and her cousin shared a bedroom. Rat contends that his niece could have testified that she didn't witness anything improper.

The PCR court made the following findings and denied this claim:

> T[he] timeframe indicates Defendant's niece would have been around the age 6 years old at the time these events occurred. Trial counsel's decision to decline investigating the defendant's niece as a potential witness did not fall outside the professional standard of competency here, because the girl was very young during the events of the criminal acts and could offer very little to aid Defendant's case. She did not sleep in the bedroom with Defendant and the victim, so she could not have witnessed anything occur. Defendant also provides no reliable information to support that she would say what he claims if she were called to testify. Because Defendant's niece could likely only offer limited statements about her visits to the house as a 6-year-old, Defendant does not show a reasonable probability that the outcome of his trial would be different if trial counsel investigated her as a potential alibi witness.

(Doc. 12, Ex. L at 6.)

Rat asserts that, when their relatives were at the home, the victim and her 6-year-old cousin shared a room, and the cousin always went to sleep first. (Doc. 6 at 8.) First, the offenses were alleged to have occurred over a 2-year period and the cousin only stayed at the house every other week for six months. Further, because Rat states that the cousin was always sleeping first, and the sexual activity was alleged to have occurred in Rat's bedroom, there is no reason to believe Rat's niece could have offered exculpatory evidence. In fact, Rat suggests only that his niece **may** have testified that she never witnessed anything inappropriate. Such testimony would be of limited value. It is Rat's burden to prove actual prejudice, but he does not substantiate to what his niece would have testified if called as a witness.

1
2
3
4

Rat fails to establish a reasonable probability that the outcome of his trial would have been different if his niece had testified; therefore, he was not prejudiced. And the state court's denial of this claim was not objectively unreasonable.

**Claim 4**

5
6
7
8
9
10
11

Rat alleges counsel was ineffective in failing to confront the victim about the differences between her pretrial statements and her trial testimony. Rat points to the following inconsistences: (a) whether sex occurred 4-5 times per week or 2-4 times per week; (b) whether saliva was used as lubrication; and (c) whether sex occurred in only one position or multiple positions. Rat also noted that counsel did not bring out the victim's pretrial statements about her inability to recall any past abuse as alleged by her mother.

12

The PCR court made the following findings and denied this claim:

13
14
15
16
17
18

> Trial counsel did a thorough and effective cross-examination of the victim, eliciting statements that could be considered to impeach her testimony. Defendant's attorneys also successfully impeached the victim's testimony with other witnesses, including Dr. Harrington, who testified that he saw no damage to the victim's hymen. Through defense counsel's cross-exam, Dr. Harrington explained that if an individual participated in intercourse at the frequency testified to by the victim, there would be damage to that individual's hymen. Simply because defense counsel did not address every instance of a statement that may have varied from the victim's previous statements does [not] constitute a breach of effective assistance. Likewise, Defendant has failed to demonstrate how he was prejudiced by his attorney's conduct.

19
20
21
22
23

(Doc. 12, Ex. L at 7.) The Court accepts as true the PCR court's finding that, on cross-examination, trial counsel was thorough, and he elicited statements from the victim and other witnesses that impeached the victim's testimony. *See* 28 U.S.C. § 2254(e)(1) (imposing a presumption of correctness to state court fact finding unless rebutted by clear and convincing evidence).

24
25
26
27
28

Rat does not attempt to rebut this finding; rather, he argues counsel could have used the victim's inconsistencies to further impeach her testimony. He contends that the victim's testimony was central to the prosecution's case; therefore, emphasizing inconsistencies with her prior statement could have damaged her credibility enough to alter the verdict. Rat ignores the fact that cross-examination on the inconsistent statements would have involved

the victim testifying that Rat sexually abused her repeatedly. Thus, further questions on those topics would have given her an opportunity to highlight her account of the abuse. This fact undermines Rat's conclusion that further impeachment of the victim's testimony could have changed the verdict. At a minimum, it was not objectively unreasonable for the state court to conclude that Rat was not prejudiced by counsel's conduct.

**Claim 5**

Rat alleges counsel was ineffective in failing to investigate the chain of custody for the bedsheet taken from his bedroom and seek exclusion of it. The PCR court made the following findings and denied this claim:

> Arizona caselaw recognizes that issues involving chain of custody do not render evidence inadmissible, rather it is for the factfinder to determine the weight of that evidence. Defendant's argument that his attorneys were ineffective for declining to litigate the admissibility of his bedsheets is therefore an inaccurate assertion of the law. Moreover, Defendant testified that both he and the victim used the bedsheets and additionally testified to ejaculating in the sheets. Defendant's conclusion that his bedsheets should have been considered unreliable evidence is thus undermined by his own testimony. The defendant cannot show he suffered prejudice by the examination of evidence consistent with facts to which he's already admitted.

(Doc. 12, Ex. L at 5.)

As pointed out by the PCR court, chain of custody questions do not preclude the admission of evidence, "unless a defendant can offer proof of actual change in the evidence, or show that the evidence has, indeed, been tampered with." *State v. McCray*, 183 P.3d 503, 507, 218 Ariz. 252, 256 (2008) (finding state need not disprove every remote possibility of tampering) (quoting *State v. Ritchey*, 490 P.2d 558, 563, 107 Ariz. 552, 557 (1971)). Rat argues the evidence was not checked-in until 11 days after it was collected, the officer that collected the sheet was biased against him, and the DNA expert testified the bedsheet had a strong foul odor. None of these assertions come close to establishing that someone had tampered with the bedsheet. The detective that collected the sheet turned it in to the property department approximately one-and-a-half hours later. (Doc. 12, Ex. 1 at Ex. 3.) Because it was not sealed and signed, she had to return to property 11 days later to perform those tasks. (*Id.*) Further, the significance of the sheet at trial was the fact that

it had Rat's sperm on it as well as the victim's DNA. The PCR court pointed out that Rat testified he had ejaculated in the sheets and the victim had slept on them. Thus, his own testimony supports finding both of their DNA on the sheets.

Because there was no basis to challenge the admissibility of the bedsheet, counsel was not ineffective for failing to do so. Further, there is not a reasonable possibility the bedsheet would have been excluded if counsel had challenged its admission; therefore, Rat cannot demonstrate that he was prejudiced by counsel's conduct. In turn, it was not objectively unreasonable for the state courts to deny this claim.

**Claim 8**

Rat alleges the cumulative error in counsel's performance denied him the right to effective assistance of counsel. The Court did not identify any deficiencies in counsel's conduct. For that reason, there is no cumulative IAC error on which Rat could obtain relief.

**<u>Claim 7</u>**

Rat alleges the jury instruction regarding the burden of proof violated his due process right to be convicted only upon a finding of guilt beyond a reasonable doubt. The trial court gave the jury the following instruction:

> The state has the burden of proving the defendant guilty beyond a reasonable doubt. In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable. In criminal cases such as this, the state's proof must be more powerful than that. It must be beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt.
>
> If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find her/her guilty. If, on the other hand, you think there is a real possibility that he/she is not guilty, you must give him/her the benefit of the doubt and find him/her not guilty.

(Doc. 12, Ex. S at 6.) The Arizona Court of Appeals denied this claim because the state supreme court had repeatedly cited favorably the instruction given at Rat's trial. (Doc. 12, Ex. A at 5.)

1

2          Rat argues that "firmly convinced" is contrary to the required finding of guilt

3    beyond a reasonable doubt. And, in his Reply, Rat takes issue with all of the language used

4    in the instruction to define reasonable doubt. (Doc. 17 at 6.) The Supreme Court has found

5    that "the Constitution neither prohibits trial courts from defining reasonable doubt nor

6    requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).

7    The governing requirement is that "taken as a whole, the instructions [must] correctly

8    conve[y] the concept of reasonable doubt to the jury." *Id.* (finding no particular words are

9    required by the Constitution) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).

10   The question before this Court is "whether there is a reasonable likelihood that the jury

11   understood the instructions to allow conviction based on proof" of something less than

12   reasonable doubt. *Id.* at 6.

          Here, the instructions stated the reasonable doubt standard clearly and required that

13   the jury's decision be based on its consideration of the evidence. The instruction's

14   definition of beyond a reasonable doubt – requiring that a juror be firmly convinced – did

15   not impermissibly lower the standard. In fact, in a concurring opinion, Justice Ginsburg

16   cited favorably an almost identical instruction, finding it "clear, straightforward, and

17   accurate." *Victor*, 511 U.S. at 26-27 (Ginsburg, J., concurring in part).[1] Upon a wholistic

18

19   _____

20         [1] The jury instruction used in Rat's trial was modeled after the Federal Judicial
     Center Pattern Criminal Jury Instruction 21. *See State v. Portillo*, 898 P.2d 970, 974, 182
21   Ariz. 592, 596 (1995). That instruction reads:

22         [T]he government has the burden of proving the defendant guilty beyond a
           reasonable doubt. Some of you may have served as jurors in civil cases,
23         where you were told that it is only necessary to prove that a fact is more likely
           true than not true. In criminal cases, the government's proof must be more
24         powerful than that. It must be beyond a reasonable doubt.

25         Proof beyond a reasonable doubt is proof that leaves you firmly convinced
           of the defendant's guilt. There are very few things in this world that we know
26         with absolute certainty, and in criminal cases the law does not require proof
           that overcomes every possible doubt. If, based on your consideration of the
27         evidence, you are firmly convinced that the defendant is guilty of the crime
           charged, you must find him guilty. If on the other hand, you think there is a
28         real possibility that he is not guilty, you must give him the benefit of the
           doubt and find him not guilty.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

review of the jury's instructions, there is not a reasonable likelihood that the jury convicted based on proof less than reasonable doubt.

The Supreme Court has found that definition of reasonable doubt in a jury's instructions violated the Due Process Clause only one time. *Id.* at 5 (citing *Cage v. Louisiana*, 498 U.S. 39, 40-41 (1990))**.** In *Cage*, the court used a variety of definitions to describe reasonable doubt, "grave uncertainty" and "actual substantial doubt," and stated that "moral certainty" was required for conviction. 498 U.S. at 40-41 (1990), *disapproved of by Estelle v. McGuire*, 502 U.S. 62, 73 (1991). Neither the Supreme Court nor any other court has determined that the reasonable doubt instruction given in Rat's case did not meet the requirements of due process. This Court has repeatedly held that the same instruction does not violate clearly established Supreme Court precedent. *See, e.g., Lopez v. Ryan*, No. CV-08-1469-PHX-PGR-MHB, 2009 WL 3294876, at *18 (D. Ariz. Oct. 14, 2009); *Ploof v. Ryan*, No. CV 09-1538-PHX-DGC, 2011 WL 587961, at *12 (D. Ariz. Feb. 10, 2011). The Court reaches that same conclusion again and finds that it was not objectively unreasonable for the appellate court to conclude the jury instruction complied with constitutional standards.

## <u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, this Court must issue or deny a certificate of appealability (COA) at the time it issues a final order adverse to the applicant. A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right, and (2) whether the

court's procedural ruling was correct. *Id.* The Court finds that reasonable jurists would not find this Court's procedural or merits rulings debatable. Therefore, a COA will not issue.

Accordingly,

**IT IS ORDERED** that the Petition for Writ of Habeas Corpus is **DISMISSED**.

**IT IS FURTHER ORDERED** that the Clerk of Court should enter judgment and close this case.

**IT IS FURTHER ORDERED** that, pursuant to Rule 11 of the Rules Governing Section 2254 Cases, in the event Petitioner files an appeal, the Court denies issuance of a certificate of appealability.

Dated this 23rd day of November, 2021.


Honorable Lynnette C. Kimmins
United States Magistrate Judge

- 18 -